IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| MARLON WHITMORE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 4:13-cv-01408 PJH |
| | ) |
| CITY OF SANTA ROSA, | ) |
| a municipal corporation, | ) |
| et al. | ) |
| | ) |
| Defendants. | ) |
| _____ | )    CERTIFIED COPY |

DEPOSITION OF DEPUTY CHARLES BLOUNT

TUESDAY, MAY 27, 2014

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1.

```
1                    I N D E X

2

3    EXAMINATION BY:                        PAGE

4    MR. NISENBAUM                            6

5

6

7                    ---oOo---

8
```

```
     Appearance Page                          3

9
     Exhibit Page                             4

10
     Location                                 5

11
     Reporter's Certificate                 124

12
     Deponent Signature Page                125

13
     Deponent Signature Waiver              126

14
     Witness Letter                         127

15
     Changes and/or Corrections             128

16
     Attorney's Notes                       129

17
```

```
18

19                    --oOo--

20

21

22

23

24

25

                                              2
```

**BARBARA J. BUTLER & ASSOCIATES**-Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

1                          APPEARANCES

2

3    FOR THE PLAINTIFFS:

4         LAW OFFICES OF JOHN L. BURRIS
          Airport Corporate Centre
5         7677 Oakport Street, Suite 1120
          Oakland, California 94621
6         (510) 839-5200

7         BY:  BENJAMIN NISENBAUM, ATTORNEY AT LAW

8

9    FOR THE DEFENDANTS:

10        SANTA ROSA CITY ATTORNEY'S OFFICE
          100 Santa Rosa Avenue
11        Room 8
          Santa Rosa, California 94504
12        (707) 543-3040

13        BY:  ROGER L. JACKSON, ATTORNEY AT LAW

14

          GEARY, SHEA, O'DONNELL, GRATTAN & MITCHELL
15        37 Old Courthouse Square
          Santa Rosa, California 95404
16        (707) 545-1660

17        BY:  STEVEN C. MITCHELL, ATTORNEY AT LAW

18

19

20

21

22

23

24

25

                                                    3

INDEX OF EXHIBITS

(None)

---o0o---

4

1    Pursuant to Notice of Taking Deposition and on

2  Tuesday, May 27, 2014, commencing at the hour of 11:09

3  a.m., thereof, at the Geary, Shea, O'donnell, Grattan &

4  Mitchell, 37 Old Courthouse Square, Santa Rosa,

5  California, before me, ANGELICA R. GUTIERREZ, CSR No.

6  13292, a Certified Shorthand Reporter and Deposition

7  Officer of the State of California, there personally

8  appeared:

9

10    DEPUTY CHARLES BLOUNT

11

12  called as a witness by the Plaintiff, who having been duly

13  sworn by me, to tell the truth, the whole truth and

14  nothing but the truth, testified as hereinafter set forth:

15

16    ---oOo---

17

18

19

20

21

22

23

24

25

5

1  briefly, while the officer was in the position that you

2  described that made you think that he -- the officer

3  was considering applying a carotid restraint?

4      MR. JACKSON:  Objection.  Lacks foundation.

5  Calls for speculation.

6      THE WITNESS:  No.

7      MR. NISENBAUM:  Q.  Okay.  Mr. Whitmore

8  appeared to be fighting that whole time; is that

9  correct?

10     A.  Yes.

11     Q.  And what was he doing that you believe was

12  fighting?

13     A.  Thrashing around with his arms and legs, his

14  entire body very violently kicking, throwing his elbows

15  back, his arms back, contorting himself.  Just very

16  violent constant motion.

17     Q.  Did you hear Mr. Whitmore make any sound?

18     A.  Not really, that I remember.

19     Q.  Okay.

20     A.  There may have been a groan or something like

21  that at one point, but that's about it.

22     Q.  Okay.  When do you recall him -- when do you

23  think you might recall him making a groan?

24     A.  I think during one of the taser applications

25  that I can remember him making a little bit of noise.

                                                    62

1      Q.   Okay.  And apart from that groan, you don't

2   recall him using any words -- strike that.

3           You don't recall him using any words during

4   this incident?

5      A.   Not at all.

6      Q.   And you don't recall him yelling or screaming?

7      A.   No.

8      Q.   You only recall one point in time when he may

9   have groaned, correct?

10     A.   Yes.

11     Q.   All right.  Now, at the point in time when you

12  observed -- up through the point in time when you

13  observed -- strike that.

14          Up to the point in time when you observed the

15  officer attempt -- in a position where a carotid

16  restraint, where the arm might be in a position to

17  apply the carotid restraint, could you tell whether or

18  not a taser had been applied or taser had been used?

19     A.   I could not tell.

20     Q.   Did you see any taser wire?

21     A.   I did not.

22     Q.   Did you see any taser in any officer's hand?

23     A.   I did not.

24     Q.   Okay.  The officer who was not applying the

25  carotid or was not in the position that a carotid might

63

1   be applied, what was he doing while the officer was in

2   that position, if you recall?

3        A.   Again, he was just standing there.  We're

4   talking in time about a few seconds.  I mean,

5   everything evolved quickly.  I remember him just

6   standing at the feet.

7        Q.   I thought I asked this, maybe I didn't take

8   the right note.  How long did you see the officer in

9   the position where the arm was in a position that he

10  might apply the carotid restraint?

11       A.   It's really hard to say.

12       Q.   Best estimate?

13       A.   The time I walked up and a little bit longer

14  after that.  So I don't know, second, 15 seconds, 20

15  seconds, best guess.

16       Q.   You didn't see Mr. Whitmore strike any

17  officer, correct?

18            MR. MITCHELL:  Objection.  Vague as to strike.

19            THE WITNESS:  Well, when he was flailing with

20  his arms and elbows, he was coming into contact with

21  the officer on his back.  And when he was flailing his

22  feet about, he was also coming into contact with that

23  officer's legs.  So technically those are strikes.

24            MR. NISENBAUM:  Q.  Okay.  And you consider

25  those to be strikes?

                                                    64

1     A.   I do.

2     Q.   Okay.  And you considered them at the time of

3   the incident to be strikes too, correct?

4     A.   Yes.

5     Q.   Okay.  And when you were interviewed, you

6   considered those to be strikes?

7     A.   I don't know if I was asked that specifically.

8     Q.   Okay.  Well, let me read to you from, it says

9   Bates stamp 90, last sentence of the page.  "Deputy

10   Blount did not see the subject strike anyone.  The

11   subject was not complying and was exhibiting, in quote,

12   'some pretty intense strength,'" close quote.

13          Does that refresh your recollection as to

14   whether or not you saw Mr. Whitmore strike anyone?

15     A.   I think at the time I was probably thinking

16   strike as in directly aim and punch more than I'm

17   thinking today of when you flail about you come into

18   contact with.

19     Q.   Not to get all NFL on you, but when you're

20   talking about strikes today, is it fair to say that you

21   may be talking about incidental contact?

22          MR. MITCHELL:  Objection.  Vague as to the

23   term incidental contact.

24          MR. NISENBAUM:  As long as it's not vague as

25   to NFL.

65

1          MR. MITCHELL:  I think he's described --

2          THE WITNESS:  I think the strike I was

3   witnessing or the contact I was witnessing wasn't like

4   a boxer type aimed and calculated.  It was just contact

5   while he was flailing his arms, his legs, his head, his

6   whole body.

7          MR. NISENBAUM:  Q.  It did not appear to be

8   deliberate strikes by Mr. Whitmore against anyone; is

9   that correct?

10         MR. JACKSON:  Objection.  Calls for

11  speculation.  Lacks foundation.

12         THE WITNESS:  I would have no idea whether it

13  was deliberate.  Whether he was flailing about

14  deliberately to strike people or just flailing about to

15  get away, I don't know.

16         MR. NISENBAUM:  Q.  Okay.  Now, did you ever

17  ask any officer if he was armed, if Mr. Whitmore was

18  armed, even though you don't know his name, but the

19  person that they were dealing with?

20         A.  I never asked.

21         Q.  And no officer ever volunteered anything about

22  that, correct?

23         A.  No.

24         Q.  When was the first time that you heard there

25  was a knife at the scene?

66

1    more clear.  You arrive at the scene.  You see what you

2    have described.  At some point in time, it's my

3    understanding that you took out your taser; is that

4    correct?

5         A.   Yes.

6         Q.   When did you take your taser out?

7         A.   As I was taking the last couple steps, right

8    up to where they were lined, Whitmore and the officer.

9         Q.   At the point in time when you took your taser

10   out, was the officer who was -- who had his chest up

11   against Mr. Whitmore's back, was he still in a position

12   where it appeared that a carotid restraint could be

13   applied?

14        A.   He was still -- he was still chest to back

15   with Mr. Whitmore and still had his arms up over his

16   shoulder, yes.

17        Q.   Okay.  Could you tell whether or not he had

18   the V in the proper location for a carotid restraint

19   below Mr. Whitmore's neck, the V with the elbow?

20        A.   I don't remember him ever having that exact

21   position.

22        Q.   Could you tell whether or not the arm that

23   came around the neck was bent at the elbow?

24        A.   It was bent.

25        Q.   Okay.  And how far bent was it?

                                                        68

1          How long was the taser in your hand prior to

2    you activating it, meaning discharging it?

3          A.    Not very long.

4          Q.    Few seconds?

5          A.    Time for me to evaluate the scene a little bit

6    and then decided to use it.

7          Q.    Okay.  And how did you use it?  In what mode?

8          A.    Dart mode.

9          Q.    From what distance?

10         A.    Very close.

11         Q.    Okay.  And where did the darts strike

12   Mr. Whitmore, if they struck him?

13         A.    The -- on the front and on his torso.

14         Q.    Okay.  And could you tell that both darts had

15   struck him?

16         A.    I couldn't really tell.

17         Q.    Okay.  What was Mr. Whitmore wearing?

18         A.    I don't remember.  I couldn't describe it.  I

19   know he had on some sort of shirt, some sort of

20   covering on his torso.

21         Q.    Do you recall if he was wearing a sweatshirt?

22         A.    I don't.

23         Q.    All right.  When you applied the -- when you

24   discharged the taser, what happened when you discharged

25   it?

74

1    A.    What do you mean?

2    Q.    The darts appeared to strike Mr. Whitmore in

3    the chest area, correct?

4          MR. MITCHELL:  I think he said upper front and

5    torso.

6          MR. NISENBAUM:  Q.  Upper front torso.  Is the

7    upper front torso the chest?

8    A.    No.

9    Q.    Okay.  What do you mean by upper front torso?

10         MR. JACKSON:  Front and torso was his

11   testimony.

12         MR. NISENBAUM:  Q.  Oh, upper front and torso?

13   A.    I'm not sure what I said now.  To me torso

14   means kind of here to here.  This is chest, torso.  So

15   maybe more descriptive would be midsection.

16   Q.    So you believe that they struck him slightly

17   below the chest?

18   A.    Yes.

19   Q.    Anatomically somewhat below the nipple area,

20   correct?

21   A.    Yes.

22   Q.    Okay.  I'm not going to get into thorax or

23   anything like that, that's beyond my biology.

24         How long did you apply the taser to him with

25   the prongs from that deployment?

1    A.   I didn't turn off until it was a full cycle.

2    Q.   Meaning five seconds?

3    A.   Five seconds.

4    Q.   You let it run its course, correct?

5    A.   Yes.

6    Q.   Did you reactivate it?

7    A.   I did later.

8    Q.   The first time it was only five seconds?

9    A.   Yes.

10   Q.   Okay.  And up to that point in time, had any

11   officer told you that the taser wasn't working against

12   Mr. Whitmore?

13   A.   Yes.

14   Q.   Okay.  And who told you that?

15   A.   The officer that was standing at the feet of

16   the suspect and the officer that was on his back.

17   Q.   When did he tell you that?

18   A.   As I was -- as I drew my taser and got -- took

19   the last couple steps, I remember him saying that.

20   Q.   And what did that mean to you that the taser

21   wasn't working against Mr. Whitmore?

22   A.   The only thing it meant to me was that at some

23   point in time, somebody had attempted a taser use and

24   found it to be noneffective.

25   Q.   Okay.  And did that have any impact on your

76

1    decision to use the taser?

2         A.   No.

3         Q.   Why not?

4         A.   Because there's a lot of reasons a taser can

5    be ineffective and it doesn't preclude me from using

6    mine.  And if it had been effective, I've seen the

7    taser end fights and conflicts very quickly without

8    injury.

9         Q.   Did Mr. Whitmore's body react in any way that

10   you associated with the taser application?

11        A.   That application that I made?

12        Q.   Correct.

13        A.   No.

14        Q.   Okay.  Did any other officer do anything with

15   respect to Mr. Whitmore during the time of that

16   application?

17        A.   Not that I can remember.

18        Q.   Do you know whether or not a taser application

19   can be conducted through the human body to another

20   human?

21        A.   Not sure what you mean.

22        Q.   You've been to taser training?

23        A.   Yes.

24        Q.   As part of the training, did they have you

25   hold -- have a group of officers hold each other's

                                                           77

1      Q.   And you were seated, based on your

2   understanding, because of the danger that you could

3   fall, correct?

4      A.   I guess that's a possibility.

5      Q.   Okay.  Well, you were trained that that's a

6   possibility, right?

7      A.   Yes, but kind of all depends on where the

8   probes are as to whether or not somebody falls.

9      Q.   In any event, so you felt the taser

10  electricity going -- how many officers were involved in

11  linking arms?

12     A.   I don't remember.

13     Q.   More than three?

14     A.   Yes.

15     Q.   Okay.  To your knowledge, could you tell

16  whether or not the taser application that you applied

17  to Mr. Whitmore was conducted in any way to any other

18  officer?

19     A.   I don't believe it was.

20     Q.   Okay.  So you went through the five-second

21  cycle, correct?

22     A.   Yes.

23     Q.   And what happened next?

24     A.   The next thing I did was, without taking the

25  cartridge off, to move the taser into a contact mode

79

1    with the cartridge still applied.

2         Q.    And that would mean, then, that the taser

3    electricity would conduct both through the taser darts

4    that have been deployed as well as through the five

5    cartridges based on your understanding, correct?

6         A.    Yes, based on my training.  The taser

7    instructor used the term cross-connect.

8         Q.    Right.

9         A.    Where it will go from the contact points to

10   the probes.  It will go a lot of ways.  Between the

11   probes, between the contact points on the cartridge,

12   and then cross between those points also.

13        Q.    So you understood that in applying the taser

14   in this manner, that it gave you a much larger spread

15   than you had initially with the darts that you fired at

16   the torso of Mr. Whitmore, correct?

17        A.    Yes.

18        Q.    Okay.  And where on his abdomen did you apply

19   it?

20        A.    The contact?

21        Q.    Yes.

22        A.    Wasn't on the abdomen.

23        Q.    Where was it?

24        A.    As I remember it was on the upper chest area

25   towards the shoulder.

80

1    Q.   Which shoulder?

2    A.   To the best of my memory it would have been

3    his -- based on his position and mine, it would have

4    been in his right upper chest area.

5    Q.   Can you point to your body where you applied

6    it?

7    A.   Somewhere up in here.

8    Q.   And it looks like you put a palm -- we don't

9    have a video camera here so we have to describe it for

10   the record.  And for the record, you put your left palm

11   over your right upper chest just below the clavicle.

12   Is that fair?

13        MR. MITCHELL:  I think it's fair to describe

14   it also as onto the shoulder.

15        THE WITNESS:  Somewhere in that area.

16        MR. NISENBAUM:  Q.  Clavicle and shoulder

17   area?

18   A.   Yes.  Upper chest to clavicle, shoulder.

19   Q.   Okay.  And how many times did you activate it

20   and apply it in that position?

21   A.   Just one pull of the trigger.

22   Q.   And did you let it run its five-second cycle

23   then?

24   A.   Yes.

25   Q.   And did Mr. Whitmore appear to react to that?

81

1      A.   Yes.

2      Q.   Okay.  And what was the range?

3      A.   From two to maybe four.

4      Q.   And what justified the -- in your

5  understanding of it at the time, in your mind, what

6  justified the kicks in the stomach on each of those

7  occasions?

8           MR. MITCHELL:  Incomplete hypothetical.

9  Relevance.

10          THE WITNESS:  Subject charged me.

11          MR. NISENBAUM:  Q.  Each time?

12     A.   Yes.

13     Q.   And he was standing each time when you kicked

14  him in the stomach?

15     A.   Yes.

16     Q.   And you kicked him in the stomach to fend off

17  the charge?

18     A.   Yes.

19     Q.   You've never kicked a stomach -- strike that.

20          You've never kicked a person who was down on

21  the ground in the stomach, have you?

22     A.   Not in the stomach, no.

23     Q.   Okay.  Okay.  So at some point the person you

24  later learned to be Mr. Whitmore rolled onto his

25  stomach; is that correct?

                                                    86

1    A.    Yes.

2    Q.    And at that point in time -- was that after

3    the contact tase to the -- just below the shoulder?

4    A.    Yes.

5    Q.    Okay.  And the officer still appeared to have

6    the carotid hold positioning of the arm?

7    A.    I don't know.

8    Q.    Okay.

9    A.    His arm was still over Mr. Whitmore's

10   shoulder --

11   Q.    All right.

12   A.    -- at that point, that's all I could see.

13   Q.    Still back to chest?

14   A.    Yes.

15   Q.    And then you tase Mr. Whitmore again, correct?

16   A.    Yes.

17   Q.    And where did you tase him this time?

18   A.    Very upper back, back, shoulder blade,

19   trapezius-type area.

20   Q.    I was going to say looks like you're pointing

21   to the right trapezius, is that the rough area?

22        MR. MITCHELL:  He's described the area.

23        THE WITNESS:  I probably can't point that far

24   back.  Shoulder blade area to trapezius area, somewhere

25   in that square.

87

1      MR. NISENBAUM:  Q.  And then this was through

2  whatever clothing Mr. Whitmore was wearing, this tase?

3      A.  Yes.

4      Q.  And how many times did you tase him in that

5  area?

6      A.  One trigger pull, one five-second application.

7      Q.  Okay.  And to your knowledge, were the darts

8  still in Mr. Whitmore's abdomen?

9      A.  I assume they were, but I couldn't see them.

10      Q.  You didn't see Mr. Whitmore pull them out, did

11  you?

12      A.  No.

13      Q.  Okay.  Did Mr. Whitmore react to this

14  application of the taser?

15      A.  Again, it's hard to tell.

16      Q.  He continued thrashing?

17      A.  Yes.

18      Q.  Did you tase him again after that?

19      A.  Not that I recall.

20      Q.  Have you reviewed the records of your taser

21  applications?

22      A.  Not during this shift, not during the day of

23  this incident.

24      Q.  Okay.  You're aware that the taser stores the

25  data of its activations, correct?

                                                    88

1      A.   The very first one.

2      Q.   Okay.  And did you take that to indicate the

3  first taser was impacting in some way?

4      A.   I did not know how to take it.  I just

5  remember hearing it at that time.

6      Q.   So the last taser cycle that you recall was to

7  the right just below the right trapezius area, correct?

8           MR. MITCHELL:  Well, he's described it three

9  times.  It's involving the shoulder blade, the

10  trapezius area.

11           MR. NISENBAUM:  Q.  Okay.

12      A.   I'm not sure I said right or left, but...

13           MR. JACKSON:  The question is vague.

14           THE WITNESS:  I'm not sure which side it was

15  at this point, but the last one was in either the right

16  or the left back shoulder area.

17           MR. NISENBAUM:  Q.  Okay.  And after that last

18  taser cycle, what's the next thing that occurred?

19      A.   As far as my actions or...

20      Q.   As far as your observations.

21      A.   Mr. Whitmore is continuing to violently resist

22  and he's not obeying any of the demands that he's

23  given.  Now that he's face down on the ground at times,

24  you know, his hands are tucked under him and he appears

25  to be reaching up under him purposefully, and at other

91

1  times he's starting to get into like a pushup position,

2  like he's trying to bridge up and regain his feet

3  maybe.  And the officer that was on his back is

4  completely exhausted and rolls off of him.  And that's

5  when Deputy Horsman, as I remember, then kind of

6  occupies that space.

7      Q.   Okay.  And up to this point in time, did you

8  see any officer use any impact weapon on Mr. Whitmore?

9      A.   I did not.

10     Q.   Did you see any officer strike Mr. Whitmore?

11     A.   I did not.

12     Q.   Is it fair to say that you never, up to this

13 point in time, saw any officer -- strike that question.

14          Did you put your taser away?

15     A.   I didn't put it in the holster.

16     Q.   What did you do with it?

17     A.   I tossed it to the side.

18     Q.   Why?

19     A.   After the third application, it was obvious I

20 wasn't getting the desired results from the taser, so

21 in my mind it was time to transition to something else.

22     Q.   And what did you decide to transition to?

23     A.   My flashlight as an impact weapon.

24     Q.   I assume you carried a baton?

25     A.   I had one available but I wasn't carrying it

                                                        92

1    on my person.

2         Q.   Are you required to carry your baton on your

3    person?

4         A.   No.

5         Q.   Are you required to carry it in your patrol

6    vehicle?

7         A.   Yes.

8         Q.   What type of baton did you have in the patrol

9    vehicle?

10        A.   A straight wood baton.

11        Q.   All right.   So you believe now it was time to

12   use an impact weapon, correct?

13        A.   Yes.   That's what I transitioned to.

14        Q.   Okay.   And Deputy Horsman was present when you

15   transition to an impact weapon?

16        A.   Yes -- you know, actually, I transitioned to

17   the impact weapon before Deputy Horsman took the

18   officer's place.

19        Q.   Okay.   Did you actually apply -- well, the

20   flashlight you used as an impact weapon, correct?

21        A.   Yes.

22        Q.   And you have been trained that you can use the

23   flashlight as an impact weapon?

24        A.   Yes.

25        Q.   Do you have an understanding as to how much

                                                          93

1    the flashlight weighed?

2         A.   I don't understand because I always carry it,

3    but I never weighed it.

4         Q.   What's your best estimate, with batteries of

5    course?

6         A.   A pound or so.

7         Q.   Okay.  And what part of the flashlight did you

8    use to strike Mr. Whitmore?

9         A.   The end opposite from the bulb end.

10        Q.   The handle?

11        A.   Yes.

12        Q.   And what is the flashlight made of?

13        A.   Aluminum.

14        Q.   So it's not plastic, correct?

15        A.   Correct.

16        Q.   And where did you strike Mr. Whitmore with the

17   flashlight?

18        A.   I struck him on his tricep areas and on his

19   upper back, shoulder, leg, trapezius areas.

20        Q.   Did you also strike him on the head?

21        A.   At one point there was an inadvertent or

22   incidental strike to the head that I can remember.

23        Q.   What?

24        A.   I can clearly remember that.

25        Q.   How many times did you strike him with the

94

1    flashlight?

2        A.   It's hard to say exactly.   I probably swung my

3    flashlight a dozen times.   But I know I hit the officer

4    once.   And I wasn't aware of it, but apparently I hit

5    Deputy Horsman once.   So ten times.

6        Q.   Ten times striking Mr. Whitmore by best

7    estimation?

8        A.   Yes.

9        Q.   Okay.   And one of those times was on

10   Mr. Whitmore's head?

11       A.   The very last time.

12       Q.   The last time.   Okay.   And what I would like

13   to do is have you estimate how many times you struck

14   him in the tricep area.

15       A.   I struck both triceps a couple times each.

16       Q.   Left and right bicep?

17       A.   Tricep.

18       Q.   I'm sorry, tricep.   Mr. Whitmore was face down

19   at the time?

20       A.   Right.   When I struck him in the tricep, he

21   was what you call in a pushup-type position.

22       Q.   Was that the first strike that you delivered?

23       A.   I don't remember whether the first strike was

24   to the tricep or to the upper back area.

25       Q.   It was -- the first strikes were either to the

                                                              95

1  tricep or the upper back area; is that correct?

2      A.   Yes.

3      Q.   And how hard did you strike him with the

4  flashlight?  What kind of effort did you put into it?

5          MR. JACKSON:  Objection.  Compound.

6          THE WITNESS:  My full effort, I guess.  I

7  don't know how hard that is.

8          MR. NISENBAUM:  Q.  And it's fair to say that

9  each strike with the flashlight to Mr. Whitmore was

10  with your full effort, correct?

11          MR. MITCHELL:  Objection.  Compound.  Vague.

12          THE WITNESS:  I don't know if each one was, I

13  don't know.

14          MR. NISENBAUM:  Q.  Okay.  Was there any

15  strike to Mr. Whitmore that was not with your full

16  effort that you can recall?

17      A.   I don't recall each strike.

18      Q.   It's fair to say that strike that you do

19  recall was with your full effort?

20          MR. MITCHELL:  Objection.  Lacks foundation.

21  Calls for speculation.

22          MR. NISENBAUM:  I'll rephrase.

23          MR. MITCHELL:  Please let me finish my god

24  damn objections before you make side comments.

25          MR. NISENBAUM:  Thank you for the courtesy.

96

1       MR. MITCHELL:  You asked him if it was on his

2   arm.

3       MR. NISENBAUM:  I got you.

4       MR. NISENBAUM:  Q.  Was there any reason why

5   you didn't strike him on the legs?

6       A.  Because of where I was positioned.

7       Q.  Was there anything that prevented you from

8   repositioning yourself to his legs?

9       A.  I was aware that other officers were there.

10  And I assumed that they were dealing with his legs.

11      Q.  Did you have any idea what they were doing

12  with his legs?

13      A.  No.

14      Q.  Did Mr. Whitmore ever strike you, whether

15  intentionally or unintentionally?

16      A.  No.

17      Q.  Okay.  The last blow you indicated with the

18  flashlight was to Mr. Whitmore's head, correct?

19      MR. MITCHELL:  Objection.  Misstates his

20  testimony.

21      MR. NISENBAUM:  Q.  Was inadvertently to

22  Mr. Whitmore's head, correct?

23      A.  Yes.

24      Q.  Okay.  And what -- where in the head was it?

25      A.  It was alongside his left side of his head

                                                    101

1    above his ear, below the top of the head.  So right

2    along the left side of his head.

3         Q.   So based on what you're pointing to, did it

4    appear that the flashlight was horizonal since it was

5    in a line kind of with his eyebrows?

6         A.   Yes.

7         Q.   Okay.  Above the ear, correct?

8         A.   Yes.

9         Q.   All right.  And not really the back of the

10   head but the side of the head, correct?

11        A.   Yes.

12        Q.   All right.  And did it seem like the

13   flashlight hit his head in a manner that it was flush

14   against the side of his head?

15        A.   How I would describe it might be that is that

16   the long cylinder part of the flashlight is what made

17   contact with his head.  So it was kind of parallel to

18   his head.

19        Q.   Okay.  And as a consequence of that,

20   Mr. Whitmore appeared to be dazed, correct?

21        A.   Yes.

22        Q.   Did he stop struggling briefly?

23        A.   Yes.

24        Q.   Can you describe what he did in that manner?

25        A.   He quit -- all I was observing was his upper

102

1    body.  He quit pushing up with his arms and his -- and

2    he laid down on the pavement.

3        Q.   Okay.  And how long was he -- what did he do

4    after he laid down?

5        A.   He was handcuffed immediately.  That was the

6    first opportunity we had where we could actually get

7    his arms into position to handcuff him.

8        Q.   Did he resume struggling after he laid down?

9        A.   Yes, after the handcuffs were on, very shortly

10   thereafter, he resumed struggling.

11       Q.   About what time period was it that he appeared

12   not to be struggling?

13       A.   Just long enough to apply handcuffs, which

14   don't take very long typically.  Ten seconds, 15

15   seconds.

16       Q.   Okay.  Your best estimate is that it was

17   approximately ten to 15 seconds when Mr. Whitmore was

18   not struggling; is that correct?

19       A.   Yes.

20       Q.   Okay.  And that started from when he was

21   struck in the side of the head with the baton, correct?

22            MR. MITCHELL:  Well, he didn't say anything

23   about a baton.  Misstates testimony.

24            MR. NISENBAUM:  Q.  I didn't mean baton.

25   Strike that.

                                                    103

1   in the side of the head?

2       A.   I didn't handcuff him.  I wasn't involved in

3   handcuffing him.

4       Q.   Did you assist in pulling his hands out from

5   underneath him?

6       A.   No.

7       Q.   What did you do after the flashlight struck

8   Mr. Whitmore in the head?

9       A.   I just observed until I put on the maximum

10  restraint cord.

11      Q.   Do you know what Officer Horsman -- Deputy

12  Horsman did from the point in time when he took a

13  position by Mr. Whitmore's head to the point in time

14  when Mr. Whitmore was struck in the head by your impact

15  weapon?

16      A.   I don't.

17      Q.   Okay.  Do you know whether or not anyone else

18  tased Mr. Whitmore apart from you?  Were you present

19  when any other tase occurred, if you know?

20      A.   Not to my knowledge.

21      Q.   Did you kneel on Mr. Whitmore's upper back and

22  pin him to the ground after you accidentally struck in

23  him on the side of the head with your impact weapon?

24           MR. MITCHELL:  Objection.  Compound.

25           THE WITNESS:  I don't have a clear memory of

105

1    doing that or not doing that.  I know I didn't handcuff

2    him.

3              MR. NISENBAUM:  Q.  Okay.  I'm going to read

4    to you and let me see if it refreshes your

5    recollection.  This is Bates stamp 90.  This is

6    starting in the middle of the third paragraph.

7              "The subject was momentarily still and

8    appeared to relax his arms.  Deputy Blount started

9    striking and knelt on his upper back area and pinned

10   the subject to the ground.  That was when the subject

11   was handcuffed."

12        A.   Yeah.

13        Q.   Does that refresh your recollection?  If it

14   does, it does.  If it doesn't, it doesn't.

15        A.   I don't have a recollection of it.  If that's

16   what I said, you know, at the day of the incident, then

17   I'm sure that's what I did.

18        Q.   Let me ask you this, this statement was taken

19   approximately how long after the incident?

20        A.   Same shift, but how many hours, I don't know.

21        Q.   Certainly within a day of the incident?

22        A.   Less than that.

23        Q.   Okay.  And it's fair to say that your

24   recollection of the incident was better at the time

25   that you gave statement than it is today, correct?

                                                      106

1    offer resistance?

2        A.   No.   He was handcuffed without any resistance.

3        Q.   Okay.   And once he was handcuffed, what

4    position was he in?

5        A.   His hands were behind back and he was laying

6    stomach down on the pavement.

7        Q.   Okay.   And what's the next thing that happened

8    once he was handcuffed?

9        A.   Well, then his -- the deputies or officers got

10   control of his legs.

11       Q.   Did he begin struggling violently after he was

12   handcuffed?

13       A.   Yes.   He continued to struggle.

14       Q.   How so?

15       A.   Arching his back, trying to raise up.   Until

16   they got his legs under control, he was kicking his

17   feet and kind of flailing his legs about.

18       Q.   Did you see if he struck anyone during that

19   time period?

20       A.   No.

21       Q.   No, he did not based on your observation?

22       A.   I didn't see him.

23       Q.   Okay.   You don't recall who retrieved the

24   restraint device he was placed in?

25       A.   No.

1     Q.   Did you see that happen?

2     A.   Not sure if I actually saw it happen.  I know

3  that it happened because I applied the cord and his

4  feet were in that position when I applied it.

5     Q.   His feet were initially in the figure four

6  when you applied it?

7     A.   Right.  You don't start applying the cord

8  until they are in a figure four position until it's

9  completed.

10     Q.   I assume then you took control of his legs

11  from somebody at some point in applying the cord?

12     A.   The person that or persons that get the legs

13  in the figure four position continue to remain in

14  control of the legs while the person applying the cord

15  wraps it around their ankles.

16     Q.   Do you know who that person was in this case?

17     A.   I don't remember.

18     Q.   Do you remember Mr. Whitmore resisting the

19  application of the figure four?

20     A.   Yes.

21     Q.   Okay.  What do you recall in that regard?

22     A.   I just remember that he was flailing his legs

23  and that it took a little bit of time and effort for

24  the officers to get legs in that position.

25     Q.   Okay.  Do you recall any officers striking

110

1   Mr. Whitmore using a knee strike during this time?

2       A.   No.

3       Q.   Do you know what a knee strike is?

4       A.   Yes.

5       Q.   What is it?

6       A.   It's when you strike someone with your knee.

7       Q.   I'm going to read to you from Bates stamp 90,

8   this is from the fourth paragraph, couple sentences in.

9   It says, "Someone retrieved a restraint cord.  The

10  officer that was at the subject's feet was having a

11  hard time getting the subject's feet into a figure four

12  for use of restraint.  Deputy Blount believed there was

13  a knee strike to the subject's thigh to get his legs

14  bent since the subject was struggling hard.  Deputy

15  Blount assisted the officer in securing the subject."

16           Does that refresh your recollection as to

17  whether there was a knee strike?

18       A.   I don't have a clear, you know, memory or

19  recollection of that sitting here today.  Obviously at

20  the time of the statement I had a clearer memory of it.

21       Q.   Once the restraint cord was applied, what

22  happened next?

23       A.   The one thing I can clearly remember is I

24  rolled him on the side, and then -- I don't really

25  think anything strikes out in my memory until medical

                                                        111

1    people arrived and he was loaded in the ambulance.

2        Q.    According to your statement, you said that the

3    subject made sounds when he was being tased that made

4    him believe the subject felt the taser being applied.

5            Is that the sound that you testified to

6    earlier today, the groan that you heard?

7        A.    Best of my memory today, that's the only time

8    I heard him say anything or make any noise.

9        Q.    Okay.  And you only recall it being one noise,

10   one time?

11       A.    I'm not sure if it was one or two sounds or

12   something.

13       Q.    Was it more than one sound or more than one

14   time that he groaned during the application of the

15   tase?

16           MR. MITCHELL:  Calls for speculation.

17           THE WITNESS:  I can just today say that during

18   that five-second application, he made some sort of

19   noise, not words.

20           MR. NISENBAUM:  Q.  Were you injured during

21   this incident?

22       A.    No.

23       Q.    What about damage to your uniform, was there

24   any?

25       A.    Not that I'm aware of.

                                                      112

1    foundation as to anything other than he observed.

2           MR. NISENBAUM:  Q.  Based on your experience?

3           MR. MITCHELL:  Same objection.

4           THE WITNESS:  I don't think the amount of

5    force was -- the amount as far as -- like I don't think

6    anything used was usual.  I think just how long it went

7    on is unusual.

8           MR. NISENBAUM:  Q.  Did you think that

9    Mr. Whitmore was intoxicated?

10     A.  I had no idea.

11     Q.  Did you think that he was impaired?

12     A.  I didn't.

13     Q.  Did you think that he was under the influence

14   of any drug or alcohol?

15     A.  Just my thoughts because of how hard he was

16   fighting and how violent he was, I thought he was

17   probably under the influence.

18     Q.  Did you ever consider that Mr. Whitmore might

19   be suffering from a mental health emergency?

20           MR. JACKSON:  Vague as to time.

21           THE WITNESS:  Not at the time of the incident,

22   no.

23           MR. NISENBAUM:  Q.  As you sit here today,

24   have you considered whether Mr. Whitmore might have

25   been suffering from a mental health emergency?

                                                      119

1     MR. MITCHELL:  To the extent that any thought

2   you may or may not have on that is based upon anything

3   that I've told you, then I instruct you not to answer.

4     MR. JACKSON:  Not likely to lead to

5   discoverable admissible evidence.

6     THE WITNESS:  I'm sorry.  I think I got it.

7   At some point in time I heard, and it was sometime

8   after the incident, I heard that his blood results had

9   come back negative for the drugs that they tested.

10     MR. NISENBAUM:  Q.  Okay.  Apart from anything

11   your lawyer has told you, are you aware that

12   Mr. Whitmore was subsequently diagnosed with

13   schizophrenia?

14     A.  At some point in time, maybe when the blood

15   results came back, I think.  I don't know whether I was

16   officially made aware or whether it was just whoever I

17   was talking to that it was discussed that he was

18   probably having some sort of mental health thing rather

19   than -- possibly rather than being under the influence

20   of drugs.

21     Q.  Okay.  I assume obviously it wasn't your

22   lawyer that told you that, correct?

23     A.  Correct.

24     Q.  Do you recall who that person was?

25     A.  No.

                                                    120

                    WITNESS LETTER

TO: Deputy Charles Blount            Date: 7.16.2014
c/o Steven C. Mitchell, Attorney At Law
    GEARY, SHEA, O'DONNELL, et al.    Depo: 5.27.14
    37 Old Courthouse Square          Ref. #14052716
    Santa Rosa, CA  95404

Re: Marlon Whitmore v. City of Santa Rosa, et al.

Dear Deputy Blount:

     The transcript of your Deposition reported in the
above-captioned cause has been prepared and will be
available at this office for your inspection and
signature for a period of 30 days from the date of this
letter.
     Please contact our office between the hours of 9:30
a.m. and 5:00 p.m. Monday-Friday, to schedule an
appointment.  Or, if you prefer, contact your attorney
to read, correct and sign the copy of your Deposition
before a Notary Public.
     Read the transcript making any changes and/or
corrections necessary.  In making any changes and/or
corrections, please use the following guide:
     1. DO NOT WRITE on the original transcript.
     2. SIGN UNDER PENALTY OF PERJURY at the end of
     the Deposition on the Deponent Signature Page.
     3. List each change and/or correction on the
     Correction Sheet provided at the end of the
     Deposition. Signature is required at the bottom of
     the Correction Page.
     4. Forward the signed Deponent Signature Page
     and Correction Sheet in addition to a copy of
     letter to:  Barbara J. Butler & Associates
                 Certified Court Reporters
                 P.O. Box 3508
                 Santa Clara, California  95055
                 (510) 832-8853 or (408) 248-2885

     Upon receipt of items requested in this letter, I
will forward copies of same to all Counsel.

                 Sincerely,

                 /s/Barbara J. Butler
                 Barbara J. Butler, CSR

cc:  All Counsel

                                                    127