UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARLON WHITMORE,

    Plaintiff,

    v.

TIMOTHY WILHELM, et al.,

    Defendants.

_____/

No. C 13-1408 PJH

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

    The parties' cross-motions for summary judgment came on for hearing before this court on September 10, 2014. Plaintiff Marlon Whitmore ("plaintiff") appeared through his counsel, Benjamin Nisenbaum. Defendants Timothy Wilhelm, Chris Peters, Jesus Avina, Thomas Bohanon, and Michael Clark (together, the "Santa Rosa defendants") appeared through their counsel, Robert Jackson. Defendants Charles Blount and Joseph Horsman (together, the "Sonoma defendants") appeared through their counsel, Robert Henkels. Having read the papers filed in conjunction with the motions and carefully considered the arguments and relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

    This is a section 1983 case, arising out of plaintiff's arrest by various officers employed by the Santa Rosa Police Department and the Sonoma County Sheriff's Department. The facts, as alleged in the operative second amended complaint ("SAC") and in plaintiff's motion for summary judgment, are as follows:

    On March 19, 2011, plaintiff (who was 17 years old at the time) was reported missing by his grandparents, who were his legal guardians. Plaintiff returned home at some point, but two weeks later, on March 31, 2011, plaintiff's grandparents again reported

him missing.  Specifically, at 1:30am on March 31, plaintiff's grandmother (Kathy Jones) spoke to defendant Deputy Joseph Horsman with the Sonoma County Sheriff's Department, and told him that plaintiff had been "acting weird" and saying that "people were after him" before he went missing.  Mrs. Jones also told Horsman that plaintiff had been seeing a mental health professional for years, though he had not been diagnosed with a specific mental health condition.

At approximately 4:00am on March 31, plaintiff was "confused, disoriented, and wanted to go home," and because his phone was not working, he "went to use the phone at a friend's house near his school."  SAC, ¶ 16.  Plaintiff knocked on the wrong door, and the people at that house called the Santa Rosa Police Department to report suspicious behavior.

At approximately 4:45am, defendant Christopher Peters (with the Santa Rosa Police Department) responded to the call, and observed plaintiff pacing back and forth and waving his arms back and forth, in a "go away" type of gesture.  Plaintiff did not respond to Peters' questions.

Soon after Peters' arrival, defendant Timothy Wilhelm (also with the Santa Rosa Police Department) arrived on the scene.  Defendant Wilhelm asked plaintiff for his identification, and plaintiff reached for his wallet, but then kept both of his hands in his back pockets.  Peters and Wilhelm each grabbed one of plaintiff's arms, and when Peters pulled plaintiff's left arm out of his pocket, he saw that plaintiff was holding a pocketknife in his hand (though plaintiff emphasizes that the knife was closed, such that the blade was not exposed).  Peters performed a pain compliance wrist lock and forced the knife out of plaintiff's hand, and then kicked it away.  Wilhelm then felt plaintiff "tense up" and performed a pain compliance rear wrist lock hold.

Peters and Wilhelm then attempted to place plaintiff in handcuffs, but plaintiff pulled away and began walking away.  Wilhelm and Peters then used their Tasers on plaintiff, but they appeared to have no effect.  Peters then struck plaintiff, using his baton, on the left knee and thigh and on the left forearm, and Wilhelm struck plaintiff with his baton on

plaintiff's upper body, but plaintiff again seemed unaffected. Peters then called for a "Code 20" for other officers to respond immediately.

Peters then used an entire can of pepper spray on plaintiff's face, but again, plaintiff appeared to have no reaction. Peters and Wilhelm then attempted to wrestle plaintiff to the ground, and Wilhelm applied a "carotid hold" for "a 34 to 35 count." Plaintiff wiggled free, so Wilhelm held him "in a bear hug position." Peters then attempted to control plaintiff's legs using a "figure four" hold. Plaintiff flailed his legs, and at some point, he heard a pop from Peters being kicked in the knee.

Defendant Jesus Avina (also from the Santa Rosa Police Department) then arrived on the scene, saw plaintiff, Wilhelm, and Peters on the ground, and kicked plaintiff in the stomach. SAC, ¶ 19. Avina then used his Taser, which appeared to have no effect.

Defendants Charles Blount and Joseph Horsman (with the Sonoma County Sheriff's Department) then arrived on the scene. Blount saw plaintiff and Wilhelm rolling around on the ground, and used his Taser on plaintiff multiple times. Avina also used his Taser again. Blount then began using his flashlight to strike plaintiff, and hit plaintiff "at least a dozen times." Horsman then got on top of plaintiff and struck him with his fists about 20 times.

Defendant Michael Clark (with the Santa Rosa Police Department) then arrived, and began to get control of plaintiff by grabbing his left arm. Blount then hit plaintiff on the head with his flashlight, which appeared to daze plaintiff, and allowed the officers to handcuff him.

However, plaintiff began to struggle again, and defendant Thomas Bohanon (with the Santa Rosa Police Department) attempted to use leg restraints on plaintiff's legs. Avina then kicked plaintiff's legs, which allowed Bohanon to gain control of them. Bohanon held on to plaintiff's legs and Blount placed leg restraints on him. After plaintiff was placed in full restraints, paramedics came and took plaintiff to the hospital.

Plaintiff was in kidney failure at the time he was taken to the hospital, and also suffered contusions, scrapes, cuts, and abrasions to his elbows, arms, hands, legs, and face. Plaintiff also suffered burns and punctures from the Taser applications. Plaintiff was

3

sedated for two days, and remained in kidney failure for three weeks, being diagnosed with acute renal failure and rhabdomyolysis, causing him to need daily dialysis. Plaintiff also suffered from compartment syndrome to his left arm and forearm, which required several surgeries.

Plaintiff filed suit on March 29, 2013, and filed the operative SAC on September 19, 2013, naming as defendants Wilhelm, Peters, Avina, Bohanon, and Clark from the Santa Rosa Police Department, and Blount and Horsman from the Sonoma County Sheriff's Department. In the SAC, plaintiff asserts one cause of action, under 42 U.S.C. § 1983, against all defendants, for deprivation of his Fourth Amendment right to be free from unreasonable searches and seizures and his Fourth Amendment right to be free from the use of excessive force.

Plaintiff now moves for summary judgment as to all defendants. However, his motion is based solely on his excessive force claim, not his search/seizure claim.

Some, but not all, of the Santa Rosa defendants have also moved for summary judgment. Specifically, defendants Bohanon and Clark have moved for summary judgment. The remaining Santa Rosa defendants (Wilhelm, Peters, and Avina) have not moved for summary judgment.

Finally, the Sonoma defendants (Horsman and Blount) filed an untimely motion for summary judgment. The court previously stated that it will consider the Sonoma defendants' filing, but only as part of their opposition to plaintiff's motion for summary judgment.

Thus, there are two motions currently before the court: (1) plaintiff's motion for summary judgment as to all defendants, and (2) defendants Bohanon and Clark's motion for summary judgment.

**DISCUSSION**

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is

4

no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011). In adjudicating

5

cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." ACLU of Nevada v. City of Las Vegas, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted).

B.    Legal Analysis

    1.    Plaintiff's motion

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 395 (1989); Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). The right to make an arrest or an investigatory stop necessarily carries with it the right to use some physical coercion or threat thereof to effect it. Graham, 490 U.S. at 395 (citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)).

The pertinent question in an excessive force case is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).

The Supreme Court has unambiguously held that allegations of the use of excessive force in the course of making an arrest or other such seizure of a person are properly analyzed under the Fourth Amendment and its "objective reasonableness" standard, not as an Eighth Amendment violation and not as a violation of due process under the Fourteenth Amendment. See Graham, 490 U.S. at 388, 395 n.10 (1989); see also Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1197 (9th Cir. 2002). Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of "substantive due process," must be used to analyze such claims. Albright v. Oliver, 510 U.S. 266, 273 (1994); Picray v. Sealock, 138 F.3d 767, 770 (9th Cir. 1998).

    The analysis of whether a specific use of force was objectively reasonable "requires

6

a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477.  The court first assesses "the quantum of force used to arrest [the plaintiff]" and then measures "the governmental interests at stake by evaluating a range of factors."  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).

Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.  In addition, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.

As an initial matter, the court notes that plaintiff's motion repeatedly refers to defendants in the aggregate, even though the officers arrived at different times, used different levels of force, and were exposed to different types of resistance by plaintiff. Accordingly, the court will separately analyze plaintiff's motion as to (1) Santa Rosa defendants Peters, Wilhelm, and Avina, the first three officers to arrive on the scene, (2) Sonoma defendants Blount and Horsman, the next two officers to arrive on the scene, and (3) Santa Rosa defendants Bohanon and Clark, the last two officers to arrive on the scene.

    a. Peters, Wilhelm, and Avina

As explained above, plaintiff alleges that Peters arrived on the scene at approximately 4:45am, and that Wilhelm arrived soon after.  Wilhelm asked plaintiff for his identification, and plaintiff reached for his wallet, but then kept both of his hands in his back pockets.  Peters and Wilhelm each grabbed one of plaintiff's arms, pulled them out of his pockets, and saw that plaintiff was holding a closed pocketknife.  Peters then used a wrist lock and forced the knife out of plaintiff's hand, and Wilhelm used a wrist lock after feeling plaintiff "tense up."  Both Peters and Wilhelm used their Tasers and their batons, Peters

7

used his pepper spray, and Wilhelm performed a carotid hold for 30 seconds. Avina then arrived on the scene, kicked plaintiff in the stomach, and used his Taser. In total, plaintiff alleges that (1) Peters struck him ten times with a baton, used his Taser four times for a total of 16 seconds, performed a wrist lock hold and a figure four leg hold, and used an entire can of pepper spray, (2) Wilhelm struck him twelve times with a baton, used his Taser five times for a total of 24 seconds, performed a wrist lock hold and a 30-second carotid hold, tackled him to the ground, and held him in a "bear hug" for a "couple of minutes," (3) Avina kicked him five times, and used his Taser seven times for a total of one minute and 18 seconds.

Defendants challenge a number of these allegations, and separately argue that plaintiff "omits several pertinent facts about the knife," including that plaintiff "became enamored of knives" in the weeks leading up to the subject incident, and that plaintiff's family hid knives from him out of concern for their own safety. But because none of the defendants had any knowledge about plaintiff's alleged relationship with knives at the time of the subject incident, these allegations are irrelevant to the excessive force analysis.

However, defendants also dispute the facts regarding the actual force used by Peters, Wilhelm, and Avina. They claim that Peters "testified he did not know" how many times he struck plaintiff with his baton, but that his "best estimate" is three times. Defendants further claim that Wilhelm "testified he did not know" how many times he struck plaintiff with a baton, and that he struck him in the leg only once. Defendants claim that Avina testified that he kicked plaintiff once in the stomach and twice in the thigh. Defendants also claim that plaintiff was subjected to "no more than 35 seconds of effective Taser application," and that Wilhelm's carotid hold did not result in any injury or difficulty breathing. However, it does appear undisputed that Peters, Wilhelm, and Avina each used Tasers on plaintiff. See Dkt. 53-1 at 14-17.

As explained above, under Graham, the court's first step in an excessive force analysis is to assess the "nature and quality of the intrusion on the individual's Fourth Amendment interests." 490 U.S. at 396. And "assessing 'the nature and quality' of a given

8

'intrusion' requires the fact finder to evaluate 'the type and amount of force inflicted.'" Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1198 (9th Cir. 2000). As to the "type" of force inflicted, it does appear undisputed that Peters, Wilhelm, and Avina each used at least an "intermediate" level of force.  See, e.g., Bryan v. MacPherson, 630 F.3d 805, 810 (9th Cir. 2010) (use of Taser constituted "intermediate" force); Young v. County of Los Angeles, 655 F.3d 1156, 1161 (9th Cir. 2011) (baton blows and pepper spray constitute "intermediate" force).  However, because of the factual disputes surrounding the "amount" of force used, the court cannot fully complete the first step of the Graham analysis.

The court also finds that there remain factual disputes regarding the second step of the Graham analysis – namely, the governmental interests at stake, including whether plaintiff posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight.

The parties dispute both the level of threat posed by plaintiff and the level of resistance exhibited by plaintiff.  Plaintiff argues that he merely "passively" resisted arrest by failing to obey commands and holding his arms underneath him – though he admits that he kicked Peters in the knee.  Defendants argue that plaintiff grasped a knife in his pocket, attempted to gain access to a patrol car in which weapons were stored, "pushed off the ground, wiggled, squirmed, flailed with legs when taken to the ground," and kicked and injured defendant Peters.

Overall, the court finds that the material factual disputes as to both prongs of the Graham test preclude summary judgment as to Peters, Wilhelm, and Avina.  The court's finding is in line with the Ninth Circuit's repeated holding that "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly," as these cases "almost always turn on a jury's credibility determinations."  See, e.g., Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).  Thus, plaintiff's motion for summary judgment as to defendants Peters, Wilhelm, and Avina is DENIED.

b.  Blount and Horsman

After Peters, Wilhelm, and Avina, the next officers to arrive on the scene of plaintiff's arrest were defendants Blount and Horsman, both officers with the Sonoma County Sheriff's Department.

Plaintiff alleges that Blount used his Taser on him, and then struck plaintiff with his flashlight, including on the head. Plaintiff alleges that Horsman got on top of him, pinned his arm, and hit him 20 times with his fists. In total, plaintiff alleges that (1) Blount struck him twelve times with a flashlight and used his Taser three or four times, and that (2) Horsman struck him 20 times with his fists, and pressed his knee into plaintiff's shoulder.

In their opposition, Blount and Horsman do not dispute that they used "intermediate or medium non-lethal force," though Blount argues that any flashlight strike to plaintiff's head was an accidental "glancing strike" that occurred after he "accidentally struck another officer."

However, in addition to the specific allegations of force as to Blount and Horsman, plaintiff also argues that these defendants are liable for acts of force in which they were "integral participants." The "integral participation" theory allows liability for officers whose individual actions may not have risen to the level of a constitutional violation, but who had some "fundamental involvement" in the conduct that allegedly caused the violation. Blankenhorn, 485 F.3d at 481 fn. 12; see also Lolli v. County of Orange, 351 F.3d 410, 417 (9th Cir. 2003) (denying officers' motion for summary judgment based on their "admissions that they were involved in the altercation and that they exerted some physical force on him," and thus, could have been "integral participants" in any alleged violation).

Defendants argue that, in order to trigger the "integral participant" doctrine, plaintiff must show the existence of some before-the-fact plan to commit the alleged violation. The court finds no support in the case law for any such limitation, and instead finds that the determinative inquiry is whether defendants had a "fundamental involvement" in the alleged violation. See, e.g., Bracken v. Okura, 955 F.Supp.2d 1138, 1152 (D. Hawaii 2013) (officers may be integral participants "even if they have no knowledge of a plan to commit

10

the alleged violation if their physical participation in the alleged violation was part of a closely related series of physical acts leading to the violation" (citing Blankenhorn, 485 F.3d at 481 fn. 12)).

The court finds that there remain disputed issues of fact regarding whether defendants Blount and Horsman were "fundamentally involved" in, and thus were "integral participants" in, any alleged excessive force used by other officers (including Avina's alleged Taser use after Blount and Horsman arrived on the scene). Thus, the court cannot fully assess the quantum of force used by Blount and Horsman, as required by the first step in the Graham analysis. The court further finds that there remain disputed issues of fact regarding the governmental interests at stake during plaintiff's arrest.[1] These material factual disputes regarding both prongs of the Graham test preclude summary judgment as to Blount and Horsman, and as a result, plaintiff's motion for summary judgment as to Blount and Horsman is DENIED. Because defendants Blount and Horsman did not timely file their cross-motion for summary judgment (as explained above), the court need not address their qualified immunity argument.

        c.        Bohanon and Clark

The last officers to arrive on the scene of plaintiff's arrest were defendants Bohanon and Clark, both with the Santa Rosa Police Department. Plaintiff alleges only that Clark pulled his left arm and assisted in handcuffing, and that Bohanon used a figure four leg hold and placed leg restraints on him.

Defendant Bohanon admits that he held plaintiff's legs, but disputes that it was a figure four hold. Bohanon and Clark do not appear to challenge the remainder of plaintiff's allegations.

---

[1] Regarding the second Graham prong, defendants Blount and Horsman attempt to introduce evidence of plaintiff's admissions made in juvenile court, arguing that those admissions preclude plaintiff from arguing that he only "passively" resisted arrest. Plaintiff has moved to strike any such evidence. The court need not resolve the motion to strike at this time, because the presence of disputed issues of material fact preclude summary judgment, regardless of whether the juvenile court evidence is admitted or excluded.

11

However, to apply the first step of the Graham analysis, the court must look not only at the specific acts of force taken by Bohanon and Clark, but also at whether they had any "fundamental involvement" in any alleged excessive force used by any other defendants, thus making them "integral participants" in those acts of force. Clark's own deposition testimony indicates that he was present while Avina kicked plaintiff, while Blount struck plaintiff with a flashlight, and while a Taser was deployed. See Dkt. 47, Ex. D at 129, 146. Bohanon's testimony indicates that he does not recall what force was used while he was present on the scene. See Dkt. 47, Ex. E.

Overall, the court finds that there remain disputed issues of fact regarding whether defendants Bohanon and Clark were "fundamentally involved" in, and thus were "integral participants" in, any alleged excessive force used by other officers. Thus, the court cannot fully assess the quantum of force used by Bohanon and Clark, as required by the first step in the Graham analysis. The court further finds that there remain disputed issues of fact regarding the governmental interests at stake during plaintiff's arrest. These material factual disputes preclude summary judgment as to Bohanon and Clark, and as a result, plaintiff's motion for summary judgment as to Bohanon and Clark is DENIED.

2.  Bohanon and Clark's motion

Defendants Bohanon and Clark move for summary judgment in their favor, arguing that they did not use excessive force against plaintiff and that they are entitled to qualified immunity.

As to Bohanon and Clark's argument that they did not use excessive force against plaintiff, the court incorporates its previous analysis, and finds that there remain material factual disputes regarding both prongs of the Graham analysis.

The court further finds that plaintiff has raised a disputed issue of material fact as to whether Bohanon and Clark failed to intercede despite having the opportunity to do so. See Motley v. Parks, 383 F.3d 1058, 1071 (9th Cir. 2004) ("[A]n officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be

12

responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.") (internal citation omitted); cf. Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000) (finding that "officers who were not present at the time of the shooting could not intercede," and that other non-shooting officers had no "realistic opportunity" to intercede).

These material factual disputes preclude summary judgment in favor of Bohanon and Clark, just as they preclude summary judgment in favor of plaintiff, and Bohanon and Clark's motion is DENIED on the merits. However, the court will separately address Bohanon and Clark's qualified immunity argument.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law"; defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. Malley v. Briggs, 475 U.S. 335, 342 (1986). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991). Qualified immunity is particularly amenable to summary judgment adjudication. Martin v. City of Oceanside, 360 F.3d 1078, 1081 (9th Cir. 2004).

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See Pearson v. Callahan, 555 U.S. 225, 235-36 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier v. Katz, 533 U.S. 194 (2001)). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. Id.

13

(noting that while the Saucier sequence is often appropriate and beneficial, it is no longer mandatory).

Regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the defendant's conduct violated a constitutional right?  Saucier, 533 U.S. at 201; see Martin, 360 F.3d at 1082 (in performing the initial inquiry, court is obligated to accept plaintiff's facts as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is stated for a violation of plaintiff's constitutional rights, but rather whether the defendants actually violated a constitutional right) (emphasis in original).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.

The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. Saucier, 533 U.S. at 202.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted.  Id.; see, e.g., Pearson, 555 U.S. at 243-44 (concluding that officers were entitled to qualified immunity because their conduct was not clearly established as unconstitutional as the "consent-once-removed" doctrine, upon which the officers relied, had been generally accepted by the lower courts even though not yet ruled upon by their own federal circuit).  If the law did not put the defendant on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Saucier, 533 U.S. at 202.

"If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine."  Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995).  If the essential facts are undisputed, or no reasonable juror could find otherwise, however, then the question of qualified immunity is appropriately one for the court.  Id. at 1100 (citing Hunter v. Bryant, 502 U.S. 224, 227-28 (1991)).  Or the court may

grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law.  See, e.g., Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir. 2003); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

The court finds that Bohanon and Clark's qualified immunity argument must be rejected under either prong.  As explained above, the court has found that there remain material disputed issues of fact regarding whether plaintiff was subjected to the use of excessive force.  If those disputed facts are viewed in a light most favorable to plaintiff, they show that Blount and Horsman violated a clearly established constitutional right.  Thus, the court DENIES Bohanon and Clark's request for qualified immunity, and DENIES their motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the court DENIES plaintiff's motion for summary judgment as to all defendants, and DENIES defendants Bohanon and Clark's motion for summary judgment.

Finally, pursuant to Local Rule 72-1, this matter is referred to a Magistrate Judge to conduct a settlement conference by **January 31, 2015.**  The parties will be advised of the date, time and place of appearance by notice from the assigned Magistrate Judge.

**IT IS SO ORDERED.**

Dated: October 10, 2014

PHYLLIS J. HAMILTON
United States District Judge

15